**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NICK A. LOCASCIO, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 9055 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| LEND LEASE (US) CONSTRUCTION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is about an unfortunate on-the-job injury at a building construction site, and who bears the legal responsibility for what occurred. The plaintiff, who is predominantly right-handed, hurt his left shoulder while pushing a wheeled cart loaded with steel and glass window panels along with a co-worker. The plaintiff was working for a subcontractor at the time, but is suing the general contractor. It is the plaintiff's theory that the defendant retained a degree of control over the plaintiff's work such that it owed a duty of reasonable care to plaintiff to see that the work was being done safely. [Dkt. #65, at 1-4, 10]. The general contractor has moved for summary judgment under rule 56, Federal Rules of Civil Procedure.

**I.**

**SUMMARY JUDGMENT**

**A.**

**Fed.R.Civ.P. 56**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The court must construe the evidence and all inferences that reasonably can be drawn from it in the light most favorable to the nonmoving party. *Allin v. City of Springfield*, 845 F.3d 858, 861 (7th Cir. 2017); *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 340 (7th Cir. 2016). But, the court makes "only reasonable inferences, not every conceivable one." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014). Not every purported factual dispute precludes summary judgment; the dispute must be material and genuine. *Alston v. City of Madison*, 853 F.3d 901, 910 (7th Cir. 2017). A factual dispute is "genuine" only if a reasonable jury could find for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Alston*, 853 F.3d at 910 (7th Cir. 2017). If the opponent – here, the plaintiff – "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]o survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of [his] case." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019).

When considering a motion for summary judgment, a court "must resist the trap of assessing the credibility of witnesses, choosing between competing inferences or balancing the relative weight of conflicting evidence." *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014). Sometimes a party makes that task difficult – perhaps by lodging speculative claims or attempting to obscure the facts, but the court must remain true to its task. *Khan v. Midwestern Univ.*, 879 F.3d 838, 840 (7th Cir. 2018).

Summary judgment was once regarded as a "drastic remedy." That might have been the case a half century ago. [Dkt. # 65, at 1-2 (citing *Kirk v. Home Indem. Co.*, 431 F.2d 554, 559 (7th Cir.

1970)]. But no longer. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327. *Accord Vovor v. Walmart, Inc.*, 2020 WL 1808217 (C.D.Ill. 2020). Today, summary judgment proceedings are commonplace. *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 865 (7th Cir. 2019). Plaintiff's reliance on cases decided prior to *Celotex*; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) and *Matsushita Electric Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986) is contrary to modern theory, which holds that summary judgment is designed to do away with the disfavor in which summary judgment was once, but no longer is held. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987)(discussing change effected by Supreme Court's 1986 rulings).

## B.

### Local Rule 56.1

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. "For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a summary judgment proceeding." *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir.2012). Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643 (7th Cir.2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc., 423*

F.3d 627, 633 (7th Cir.2005).

The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber,* 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir.2009); *Bay Area Business Council, Inc.,* 423 F.3d at 633.

The district court is entitled to enforce strict compliance with its local rules regarding summary judgment motions. *Mendoza v. Herrera*, 2020 WL 3975468 (N.D.Ill. 2020). *See also Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015)("This court has repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment . . . ."); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 537 (7th Cir.2011); *Schmidt v. Eagle Waste & Recycling, Inc.,* 599 F.3d 626, 630 (7th Cir.2010). Responses and facts that are not set out properly and appropriately supported in a Rule 56.1 filing will not be considered. *See Shaffer v. American Medical Association,* 662 F.3d 439, 442 (7th Cir.2011); *Bay Area Business Council,* 423 F.3d at 633. Moreover, when a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner the rule demands, those facts may be deemed admitted for purposes of the motion. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015); *Cracco v. Vitran Express, Inc.,* 559 F.3d 625, 632 (7th Cir. 2009).

The plaintiff's presentation has not adhered to these requirements. To begin with, the plaintiff, without leave, filed a statement of facts that violated Local Rue 56.1's paragraph limit by

4

over 100%. [Dkt. ## 68, 69]. Rather than simply striking the statement for non-compliance, *see, e.g.,* *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014), plaintiff was given a second opportunity to file a compliant statement. [Dkt. # 69]. The plaintiff did so, filing a proper statement a few days later. [Dkt. #71]. But the plaintiff never filed – or sought to file – a new memorandum of law and, so, the plaintiff continues to rely on facts that are no longer part of the record, trimmed, as they were, by the plaintiff's amended – and belatedly compliant – Local Rule 56.1 Statement. [Dkt. # 65, at 4, 7-10 (citing Facts Nos. 100, 101, 103, 104, 105, 113, 116-119, 121, 123-128, 129, 130, 131, 132, 135, 136, 138, 141, 142)]. As a result, there is precious little in the way of evidence, properly before the court, to support the plaintiff's opposition to the entry of summary judgment in defendant's favor. *See, e.g., Mervyn v. Nelson Westerberg, Inc.*, 76 F. Supp. 3d 715, 720–21 (N.D. Ill. 2014) (denying summary judgment because the movant had violated Local Rule 56.1 by filing briefs that cited directly to the record rather than the parties' Local Rule 56.1 statements and responses); *Thorncreek Apartments III, LLC v. Vill. of Park Forest*, 970 F. Supp. 2d 828, 838 (N.D. Ill. 2013)(brief improperly cited to record rather than statement of facts); *Alvi v. Metro. Water Reclamation Dist. of Greater Chi.*, 2006 WL 1762032, at *2 (N.D.Ill. June 23, 2006)(" . . . response memorandum is written without ever referencing the Rule 56.1 . . . .").

A closer look demonstrates why plaintiff's submissions are inadequate to stave off summary judgment. Essentially, the manner in which plaintiff has compiled and submitted his materials dooms his case. A few examples will serve to illustrate the fundamental problems. We discuss one of the most significant first. In his brief, plaintiff submits that "given what [he] was doing, it was unsafe, and that if [defendant's supervisory personnel] saw him doing it, they would have stopped him from doing it." [Dkt. #65, at 8]. He cites three paragraphs from his statement of facts:

paragraphs 88, 102, 124. [Dkt. #65, at 8]. Two of those paragraphs, 102 and 124, are not part of the record; they are not found in plaintiff's statement of facts. [Dkt. #71]. Paragraph 88 only indicates that defendant provided a safety manual. It says nothing about whether what plaintiff was doing was unsafe or whether defendant's supervisory personnel would have stopped him if they saw him. [Dkt. #71, at 88].

A court cannot resurrect the plaintiff's improper statement of facts that was stricken under the Local Rules and applicable case law [Dkt. # 69], of course, but it would be of no help to plaintiff if it did. Paragraph 88 in the stricken statement says only if supervisory personnel saw someone doing something in an unsafe manner, they would tell them to do it in a different way. It doesn't say that what plaintiff was doing – pushing a dolly with a co-worker was unsafe or that anyone would have stopped him from doing it. [Dkt. #68, ¶. 88]. Paragraphs 102 and 124 point to testimony from two of defendant's supervisory personnel indicating that would stop an individual from trying to push a loaded dolly *on their own*. [Dkt. #68, Pars. 102, 124]. But that's not what plaintiff was doing. He was pushing the dolly with a co-worker. [Dkt. #68-1, at 17-18]. Even if the court were to combine the plaintiff's stricken statement of facts with his brief, all the court would get would be a factual scenario that has nothing to do with the actual facts of the case.

A few more example suffice to demonstrate why plaintiff should not prevail on summary judgment. At another point in his brief, plaintiff submits that the defendant had a system to determine whether a subcontractor's means were unsafe, citing paragraphs 85, 105, 129, 30, and 142. [Dkt. # 65, at 4]. But paragraphs 105, 129, 30, and 142, are not part of the record. [Dkt. # 71], and paragraph 85 says nothing about any system, only that defendant cannot transfer obligations without consent of the site owner. [Dkt. #71, ¶. 85]. The question, however, is what those obligations were.

6

Plaintiff then submits that defendant had the authority to stop work, citing paragraphs 56, 62, 65, 88, 99, 103, 125, and 132. [Dkt. # 64, at 4]. There are no paragraphs 99, 103, 125, or 132. [Dkt. # 71]. Paragraph 56 says there were safety meetings; paragraph 62 says that defendant provided a mechanical device for moving windows after plaintiff's injury; paragraph 88 says there was a safety manual addressed to subcontractors. [Dkt. # 71, Pars. 56, 62, 88]. Only paragraph 65 is arguably on point. It asserts that one of defendant's superintendents had the authority to stop subcontractor employees if he saw them doing something unsafe. [Dkt. # 64, ¶. 65]. The superintendent testified that if he saw one of the workers doing something unsafe, he would point that out and ask them to do it another way. He did not testify that he could direct the manner in which they would choose to do it, however. [Dkt. # 68-4, at 39-40].

Plaintiff continues in this fashion throughout his brief. He claims defendant was contractually obligated to the developer to control the means, method, and safety of plaintiff's work, but cites paragraph 136, which is not in the record. [Dkt. #65, at 6-7]. He submits that defendant could not transfer its obligations to Permasteelista, but cites another non-record paragraph, paragraph 135. [Dkt. # 65, at 7]. He asserts that defendant retained the authority to control the means, methods, and procedures of the work, but his cite is, again, to a non-record paragraph. [Dkt. # 65, at 7]. Plaintiff also claims defendant had the authority to direct Permasteelista as to what equipment it used to complete the work safely and could stop the work until they complied; once again, the cited paragraph, 121, is not part or the record. [Dkt. # 65, at 8].

Plaintiff points to one of the defendant's site superintendents, Mr. Petricek, as an example of the control defendant supposedly had over the means and methods of Permasteelista – and

plaintiff's work. [Dkt. #65, at 9]. But none of the paragraphs plaintiff directs the court to as evidence – 122 through 128 – are part of the record. [Dkt. #65, at 9]. Moreover, the argument presents a hypothetical situation: what Mr. Petricek would say if he saw a worker pushing a rack of curtainwall *by themselves*. [Dkt. #65, at 9]. There is no evidence that that ever happened.

Flawed factual submissions, like those involved here, in essence give a court two options: either reject the flawed submission (and decide the case on the record as it exists) or, in effect, take over the role of counsel and scour the record for the facts that counsel did not – but perhaps should have – brought to the court's attention. The first option is the only legitimately permissible one under our adversary system. Call it what you will, the reasons for the prohibition on judges in effect becoming actively involved in a case go to the very heart of our system of justice. As the Supreme Court recently stressed, "[i]n our adversarial system of adjudication we follow the principle of party presentation." *United States v. Sineneng-Smith*, _U.S._, 140 S.Ct. 1575, 1579 (2020). That principle assigns to the court the role of "neutral arbiter of matters the parties present." *Id.* Thus, "as a general rule, [o]ur system is designed around the premise that [parties represented by competent counsel] know what is best for them and are responsible for advancing the facts and arguments entitling them to relief.'" *Id.* at 1579. (Brackets in original).

Here, however, attempting to resuscitate the plaintiff's current, flawed, factual presentation would necessarily require the court to perform tasks and assume a role that is foreign to our scheme of adjudication. It is unclear what plaintiff legitimately expects the court to do with his second Statement of Facts, which is not proper under the Local Rules and which now is the only one before the court. But, as the Supreme Court and the Seventh Circuit have said, it is not for a court to do the job that our representative system of justice accords exclusively to counsel. *See, e.g., Bunn v. Fed.*

*Deposit Ins. Corp. for Valley Bank Illinois*, 908 F.3d 290, 297 (7th Cir. 2018); *Rahn v. Bd. of Trustees of N. Illinois Univ.*, 803 F.3d 285, 294 (7th Cir. 2015); *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 711 (7th Cir. 2015).

Moreover, as we have shown, it would not only be unfair for a court to assume the role of counsel for one of the parties, *United States v. 5443 Suffield Terrace, Skokie, IL*, 604 F.3d 504, 510 (7th Cir. 2010), but it would also be unfair to other litigants whose cases languish while the judge bores through dusky papers to find factual material that counsel should have highlighted – if it existed. *Bond v. Coca Cola*, 806 F.2d 1324, 1328-29 (7th Cir. 1986).[1]  Few judges want to be draconian about rules, but strained accommodation for one side improperly disadvantages the other. The Ninth Circuit has put it well:

> If the district court, or later this court, searches the whole record, in practical effect, the court becomes the lawyer for the respondent, performing the lawyer's duty of setting forth specific facts showing that there is a genuine issue for trial. The movant is then denied a fair opportunity to address the matter in the reply papers.

*Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The Seventh Circuit has perhaps said it best: "it is not a judge's job to assist one advocate at another's expense." *United States v. Gustin*, 642 F.3d 573, 575 (7th Cir. 2011).

Plaintiff was already given an accommodation in this case: a second chance to file a rules-compliant statement of facts. He did not do so. And the court cannot do so for him. That leaves the parties where our system of adjudication puts them – on their own and not dependent upon the court. *Sineneng-Smith,* 140 S.Ct. at 1579.

---

[1] As the Seventh Circuit has quaintly put it, judges are not like pigs hunting for truffles, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), and are not to play archaeologist with the record. *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir.1999). *See also King v. Ford Motor Co.*, 872 F.3d 833, 838 (7th Cir. 2017).

The arguments throughout the brief, unsupported as they are by proper citations to the record, may be deemed waived. *See, e.g.*, *Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 306 (7th Cir. 2020); *Felton v. Bartow*, 926 F.3d 451, 467 n.5 (7th Cir. 2019)(arguments unavailing where citations did not support assertions); *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir.2004) (where party fails to cite the record, "we will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him."). Thus, we are left with defendant's submissions and the task is simply to determine whether defendant has met its burden of showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II.

## FACTS

And so, hamstrung to an extent by the manner of plaintiff's presentation, we set forth the underlying facts. The defendant, Lend Lease was the general contractor for the construction of a high rise building at 444 West Lake Street in Chicago. At the time of his injury, the plaintiff worked for Permasteelista, the curtainwall contractor for the project. The plaintiff claims to have been injured on November 13, 2015, while pushing large steel racks of curtainwall panels at the River Point Tower project in a staging area on the fourth floor of that building along with a co-employee. [Dkt. #63-7, Pars. 4-7, 23]. Mr. Sandor, defendant's environmental health and safety manager, testified that two workers pushing such carts in this manner was typical practice and acceptable from a safety standpoint. [Dkt. #68-5, at 37-39]. Mr. Petricek, defendant's senior superintendent, testified similarly. While he might have stopped one individual from trying to push one of these carts, two people pushing it was typical, and he wouldn't regard it as dangerous or unsafe. [Dkt. #68-6, at 41].

Plaintiff's co-worker also testified that there would always be at least two workers pushing the carts. [Dkt. # 68-3, at 41].

In any event, while pushing a rack with his co-worker, the plaintiff felt a muscle pull in his shoulder. [Dkt. # 63-5, Locascio Dep., at 18]. He didn't see a doctor until a month later for his annual checkup, at which time his doctor noted:

> left anterior shoulder pain for about one month. Worse at night. Can't sleep on it.
> Normal ROM, but with pain. Pain started when he was doing a lot of lifting at work.
> Take ibuprofen, 800 milligrams, with mild relief.

[Dkt. # 63-5, Locascio Dep., at 31]. An MRI revealed a torn rotator cuff. [Dkt. # 63-5, Locascio Dep., at 32]. Plaintiff returned to work with some accommodations, he was referred to an orthopedist, and Norco was added to his prescriptions. [Dkt. # 63-5, Locascio Dep., at 34-36]. Eventually, a few months later in March 2016, he had to have shoulder surgery. [Dkt. # 63-5, Locascio Dep., at 46]. Then it was months of physical therapy and work-hardening before he could return to his job the following November and adjust to returning to work. [Dkt. # 63-5, Locascio Dep., at 50]. He made, and settled, a workers' compensation claim regarding the injury. [Dkt. # 63-5, at 55-56].

The panels plaintiff and his colleague would be moving were delivered to the site in steel racks with wheels on the bottom. Permasteelista assembled the panels, packed them into the racks, and transported them to the staging area at the jobsite. Permasteelista came up with the staging plan for the units and chose how to move the units to the staging areas at the jobsite. Lend Lease was responsible for setting the staging areas and excluding other subcontractors from those areas. [Dkt. # 63-7, Pars. 8-15; #71, Pars. 8-15]. The staging area involved here was the 4th floor. Permasteelista

workers transported the units there, disassembled the racks, and separated the individual curtainwall panels. Permasteelisa workers then moved the glass panels close to the edge of the building where a crane would pick them up and take the panel up to the floor where it would be installed. While Permasteelisa workers were installing curtainwall panels, an "exclusion zone" was put in place that limited access to key people working underneath subcontractors. The exclusion zone for curtainwall installation was specific to Permasteelisa; even Lend Lease personnel were prohibited from entering the zone. [Dkt. # 63-7, Pars. 17-21; #71, Pars.17-21].

The parties agree that the contracts at work here are central to the question of whether defendant can be held responsible for plaintiff injuring his shoulder. *See Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶¶ 31, 33-35, 412 Ill.Dec. 833, 77 N.E.3d 1 (2016)(written agreement between employer and independent contractor best indicator of the employer retained control sufficient to trigger the potential for liability). First, there is the contract between the defendant and the developer, River Point, LLC, which says the following regarding safety:

> 10.1.1 Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Work. The Project shall conform to the Contractor's Global Minimum Requirements for Environment Health and Safety, as evidenced by project safety plans and site logistics plans. The Contractor reserves the right to delegate responsibility for safety implementation and safety functions including the obligations hereunder to Subcontractors performing construction work and who are responsible for directly creating, controlling and correcting conditions at the work site. Such delegation of responsibility does not release Contractor from ultimate responsibility and liability for safety on the Project Site.

[Dkt. #63-7, ¶. 25; Dkt. #71, ¶. 25].

The subcontract between defendant and plaintiff's employer, Permasteelisa, contained the following language regarding Permasteelisa's responsibility for work, supervision, and provision

12

of materials and equipment:

> ARTICLE 1, WORK. The term "work" means: (I) the furnishing, and performance of all labor and materials by Subcontractor, at or for the benefit of the Project which is within the general scope of this Subcontract (as that term is defined in Exhibit B) and the Contract Documents (as that term is defined in Schedule 1 ), or which can be reasonably inferred ,from the general scope of this Subcontract or the Contract Documents; (ii) unless specifically expressly excepted, the furnishing by Subcontractor of all: labor, material, equipment, supplies, plant, tools, scaffolding, hoisting, temporary facilities, transportation, superintendence, inspections and temporary construction of every nature; (iii) that which is to be produced and supplied pursuant to this Subcontract; and (iv) the obligation of Subcontractor to visit the Project site, and to fully acquaint and familiarize itself with the site, surrounding and subsurface conditions and the character of the operations to be carried on at the site, and make such investigations as Subcontractor may deem fit or as may be prudent for Subcontractor to fully understand the facilities, physical conditions and restrictions attending the Work. All Work shall be completed strictly in accordance with the requirements of this Subcontract and the Contract Documents.

[Dkt. #63-7, ¶. 28; Dkt. #71, ¶. 28].

Further on, the subcontract between defendant and Permasteelisa set forth Permasteelista's

responsibilities for staffing and supervision:

> As a part of its obligation to provide and perform the Work, Subcontractor recognizes its responsibility to furnish a competent and adequate staff and use its best skill and attention for the proper administration, coordination, supervision and superintendence of the Work; (i) organize the procurement of all materials and equipment so that they will be available at the time they are needed for the Work: (ii) keep an adequate force of skilled workers on the job to complete the Work in strict accordance with all requirements of the Contract Documents: (iii) maintain throughout the duration of the Work a competent superintendent and any necessary assistants, all of whom shall be acceptable to Contractor and shall not be changed without the consent of Contractor; (iv) enforce discipline and order among Subcontractor's employees and not to employ at the Project any unfit person or anyone not skilled in the task assigned; (v) provide supervision by experts in all aspects of the application of the materials, equipment or system being fabricated and installed; and (vi) submit to Contractor the names, responsibilities and titles of the principal members of Subcontractor's staff.

13

[Dkt. #63-7, ¶. 29; Dkt. #71, ¶. 29].

The subcontract also addressed the topic of worksite safety. While Permasteelista had to comply with defendant's demands that it take corrective safety measures, even if defendant made no such demands, Permasteelista still had responsibility for safety:

> ARTICLE 15, SAFETY. Subcontractor agrees that the prevention of accidents to workers engaged upon or in the vicinity of the Work is its responsibility, even if Contractor establishes a safety program for the entire Project. Subcontractor shall establish and implement safety measures, policies and standards conforming to those required or recommended by governmental or quasigovernmental authorities having jurisdiction and by Contractor and Owner, including, but not limited to, any requirements imposed by the Contract Documents. Subcontractor shall comply with the reasonable recommendations of insurance companies having an interest in the Project and shall stop any part of the Work that Contractor deems unsafe until corrective measures satisfactory to Contractor have been taken. Contractor's failure to stop Subcontractor's unsafe practices shall not relieve Subcontractor of its responsibility therefor.

[Dkt. #63-7, ¶. 30; Dkt. #71, ¶. 30].

And, the subcontract required that Permasteelisa:

> furnish all labor, material, equipment, engineering, hoisting and supervision to furnish and install all Curtainwall in accordance with the following requirements in the Contract Documents, all of which constitutes the Work to be performed 'by Subcontractor. It is understood that drawings and specifications are scope documents which indicate the general scope of the project, and as such, the drawings and specifications do not necessarily indicate or describe all Work required for the full performance and completion of this Work. All Work required for Curtainwall as defined by the general scope shown on the documents is included. Subcontractor, therefore, must comprehend the full scope of Work and anticipate all Work reasonably inferable in the contract documents Time is of the essence.

[Dkt. #63-7, ¶. 31; Dkt. #71, ¶. 31]. And finally, the safety manual covering the project that defendant provided to Permasteelista dictated that Permasteelista had to assess any manual lifting tasks and provide "appropriate equipment or lifting aids." [Dkt. #71, ¶. 89]. And, it had to instruct

14

its employees on safe lifting techniques.  [Dkt. #71, ¶. 89].

### III.

### ANALYSIS

### A.

Under Illinois law, a general contractor like the defendant is typically not liable for the conduct of its subcontractors. *Carney v. Union Pac. R.R. Co.*, 2016 IL 118984 ¶ 31, 77 N.E.3d 1, 7 (2016). It's a common-sense rule.  A general contractor has "no control over the details and methods of the independent contractor's work" and, as a result, "is not in a good position to prevent negligent performance." *Carney*, ¶ 32, 77 N.E.3d at 7.  But, general rules always come with exceptions, and Illinois courts have long recognized an exception under section 414 of the Restatement. *Carney*, ¶¶ 33-35, 77 N.E.3d at 8. Under that exception, a general contractor who employs a subcontractor, but retains a sufficient degree of control over its work, is subject to liability for physical harm to others – a worker like the plaintiff, for example – for whose safety the general contractor owes a duty of reasonable care.  *Carney*, ¶ 33, 77 N.E.3d at 8; Restatement (Second) of Torts § 414 (1965).

Because an employer of an independent contractor is typically not answerable for the contractor's negligence, "the employer's liability must be based upon his own personal negligence." *Carney*, ¶ 36, 77 N.E.3d at 9, quoting Restatement (Second) of Torts, Ch. 15, Topic 1, Introductory Note, at 371 (1965).  Thus, the rule set forth in section 414 provides a basis for the imposition of

direct, rather than vicarious, liability. *Carney*, ¶ 36, 77 N.E.3d at 9.  As the Illinois Supreme Court explained, fairly recently, in *Carney*:

> If the control retained by the employer is such that it gives rise to a master-servant relationship, thus negating the person's status as an independent contractor, the employer may be liable for the negligence of the contractor's employees under the law of agency. Agency law, under which an employer may be vicariously liable for the torts of its employees, is distinct from the principles encompassed in section 414, under which an employer is directly liable for its own negligence. In short, "section 414 takes over where agency law ends.

*Carney*,  ¶ 36, 77 N.E.3d at 9.  Thus, the existence of a duty of reasonable care, and liability for negligence generally, turns on the extent to which the hiring entity controls the work of the independent contractor.  *Carney*, ¶ 41, 77 N.E.3d  at 10.

There is no definition of what constitutes sufficient control. Not surprisingly, it has to be assessed on a case-by-case basis, which provides wiggle room but little predictability for contractors and laborers. *See Moiseyev v. Rot's Bldg. & Dev. Inc.*, 369 Ill. App. 3d 338, 350–51 (2006).  There are a few guidelines, but the focus, as can be seen from the Illinois Supreme Court's thorough discussion of the issue in *Carney* and the Seventh Circuit's earlier careful discussion in *Aguirre v. Turner Const. Co.*, 501 F.3d 825 (7th Cir. 2007), is on the distinction between a general kind of oversight that all general contractors have over a project, and a retention of control over details of how a subcontractor does its work.  It is a matter of delegation versus micro-management.  As the Seventh Circuit put  it:  "In determining whether that level of control has been retained, Illinois courts ask whether the principal merely retained general oversight of work progress and safety or actually engaged in detailed supervision and/or control of subcontractors' methods and means of performing work.*"  Aguirre v. Turner Const. Co.*, 501 F.3d 825, 830 (7th Cir. 2007).  Here, throughout the record, it is clear that the defendant's retention was "general oversight" as opposed

16

to detailed supervision.

### B.

We begin with the contract between the defendant and Permasteelista because the written agreement between the general contractor and the subcontractor is "[t]he best indicator of whether the defendant retained control sufficient to trigger the potential for liability under section 414." *Carney*, 77 N.E.3d at 10. In this case, the agreement is filled with indicators that defendant did not intend to and did not retain sufficient control over Permasteelista's work – over the "details and methods" of that work, *Carney*, ¶ 32, 77 N.E.3d at 7 – to incur liability under Section 414.

Under the terms of the agreement, Permasteelista was responsible for all labor, material, equipment, supplies, tools, hoisting, transport, superintendence, and inspections. [Dkt. #63-7, ¶. 28; Dkt. #71, ¶. 28]. Permasteelista had to provide oversight of its portion of the project, including putting a competent superintendent in place. [Dkt. #63-7, ¶. 29; Dkt. #71, ¶. 29]. Thus, Permasteelista was responsible for all "all aspects of the application of the materials, equipment or system being fabricated and installed . . . ." [Dkt. #63-7, ¶. 29; Dkt. #71, ¶. 29]. If these provisions don't place "means and method" securely in Permasteelista's hands, one wonders what would. *See Carney*, ¶. 45, 77 N.E.3d at 10 (". . . contract required [subcontractor] to furnish, at its own expense, 'all superintendence,' as well as all 'labor, tools, equipment, materials, and supplies,' necessary to [perform the work]. These provisions do not evince an intent by defendant to retain control over [subcontractor's] work.").

The contract also made Permasteelista responsible for safety. It was to "establish and implement safety measures, policies and standards conforming to those required or recommended by governmental or quasigovernmental authorities having jurisdiction and by

Contractor and Owner." [Dkt. #63-7, ¶. 30; Dkt. #71, ¶. 30]. This provision is not as exclusive as the foregoing provisions, given the defendant input into safety measures. Indeed, it goes on to provide that Permasteelista had to "stop any part of the Work that Contractor deems unsafe until corrective measures satisfactory to Contractor have been taken." [Dkt. #63-7, ¶. 30; Dkt. #71, ¶. 30]. Plaintiff, throughout his brief, focuses on defendant's authority to stop work if it was unsafe. [Dkt. #65, at 4, 7, 8, 9]. But such provisions are "part of the general rights reserved to someone, like defendant, who employs a contractor, rather than evidence that defendant retained control over the manner in which work by [contractor] was performed." *Carney*, 77 N.E.3d 1, 10–11. The Restatement (Second) of Torts § 414, Comment c (1965) put it this way: "It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail." See also *Cruz v. Power Constr. Co., LLC*, 2018 WL 3997838, at *9 (Ill. App. Ct. 2018).

A rule that vested general liability for all on-site accidents with a general contractor simply because it stopped a subcontractor's worker from doing something unsafe of dangerous – plaintiff gives the example of pounding with his fist [Dkt. #65, at 9] – would be detrimental to the overall safety of works on construction projects. Why discourage a general contractor from looking out for laborer's on its project regardless of who their employees might be? "To hold otherwise would penalize a defendant's safety efforts by creating, in effect, strict liability for personal injury to any job site employee" *Carney*, ¶ 61,77 N.E.3d at 13; *see also Cruz v. Power Constr. Co., LLC*, 2018

18

WL 3997838, at *9 (Ill. App. Ct. 2018)(evidence of post-dent remedial measures "indicate[d] that [general contractor] only sought to avoid another accident by investigating what happened and suggesting a different way to complete the work. Such conduct is insufficient to establish a duty under section 414.").

So, the written agreement between defendant and Permasteelista leaves no doubt that we have a situation where the defendant retained a typical kind of general oversight of Permasteelista's work, rather than control of the methods and details. It is with good reason, then, that plaintiff spends little time discussing the provisions of that contract. Instead, plaintiff focuses on the contract between defendant and the developer. [Dkt. #65, at 6-7]. That agreement provided that defendant was "responsible for initiating, maintaining and supervising all safety precautions and programs . . . [in conformity with defendant's] Global Minimum Requirements for Environment Health and Safety, . . . ." [Dkt. #63-7, ¶. 25; Dkt. #71, ¶. 25]. Then, in a pair of provisions that make one question the drafting of those who were responsible for the document, assure the reader that only lawyers could have been involved in drafting the document, the agreement gives defendant "the right to delegate responsibility for safety implementation and safety functions including the obligations hereunder to Subcontractors performing construction work and who are responsible for directly creating, controlling and correcting conditions at the work site" but also states that "[s]uch delegation of responsibility does not release [defendant] Contractor from ultimate responsibility and liability for safety on the Project Site." [Dkt. #63-7, ¶. 25; Dkt. #71, ¶. 25]. So, while the drafters gave the defendant the right to delegate responsibility for safety, they didn't release the defendant for responsibility and liability for safety.

But, again, under Illinois law, general contractors aren't liable for accidents caused or visited

upon subcontractors' employees. *Carney*, ¶ 31, 77 N.E.3d at 7. Delegation enters into the equation only if the general contractor *doesn't* delegate responsibility for safety. As we have seen, defendant delegated responsibility and didn't retain control here, so its ultimate responsibility and liability, at least for plaintiff's injury, is no more than the law dictates, which is none at all. What might be the case as between the developer and the defendant, the parties to the contract after all – and responsible for drafting that contradictory provision – is of no moment here.

Plaintiff relies on *Moorehead v. Mustang Const. Co.*, 354 Ill. App. 3d 456, 461 (2004) to argue that the contract between the developer and defendant makes defendant liable to him. In *Moorehead*, the court found the general contractor retained sufficient control over the details of the subcontractor's work to be liable for the subcontractor's worker's fall from a ladder. Significantly, the general contractor knew of the plaintiff's unsafe use of the ladder, and that it had been going on for weeks. *Moorehead*, 354 Ill. App. 3d at 458, 460. That presents a wide gulf between *Moorehead* and this case where no one observed plaintiff doing anything unsafe, and the evidence is that plaintiff and other Permasteelista workers were pushing the curtainwall dollies is the typical, acceptably safe way. In *Moorehead* there was liability under the law in the first instance; here there is not.

*Moorehead* also addressed whether the general contractor delegated its authority and found that the contract between the developer and the general contractor controlled. That contract stated that the general contractor was "fully and solely responsible for the jobsite safety." *Moorehead*, 354 Ill. App. 3d at 461. But, unlike the contract here, the *Moorehead* contract did not grant the general contractor the right to delegate responsibility for safety. *Moorehead*, 354 Ill. App. 3d at 461. As such, the case is not helpful here. *See Huss v. Ratos*, 2014 WL 7338532, at *8 (Ill. App. Ct. 2014)("In . . .circumstances, where the general contractor has agreed that he alone will ensure

workplace safety, that duty may be nondelegable. . . .However, summary judgment for the general contractor may be appropriate if the subcontractor is contractually responsible for worksite safety and the general contractor has no active role in ensuring safety.").

Still, if the agreement between the general contractor and subcontractor provides no evidence of retained control by the general contractor, such control may yet be demonstrated by evidence of the general contractor's conduct at variance with the agreement. *Carney*, ¶¶ 84, 86, 77 N.E.3d at10. The plaintiff points out a few facets of the way things were arranged at the worksite that he claims show sufficient control, but they are of little significance. In this regard, the plaintiff relies exclusively on *Foley v. Builtech Constr., Inc.*, 2019 WL 3312196, at *2 (Ill. App. Ct. 2019) [Dkt. # 65, at 4-5], where the Appellate Court found that the evidence of retained control was sufficient to present a genuine issue of fact for trial. The plaintiff submits that all the elements in *Foley* are present in this case: a project superintendent inspecting the worksite daily, safety measures in place, a safety manual, and a safety supervisor monitoring the worksite who was authorized to halt unsafe practices. [Dkt. #65, at 4]. Of course, as already discussed, plaintiff's struggles with the Local Rules have left most of what might have been his evidence out of the record. But, even if that were not the case, the comparison of the foregoing elements with the facts of this case demonstrates that all the elements in *Foley* are definitely not present here.

In *Foley*, the injury was caused when a subcontractor's worker tried to move improperly-stored rebar that was piled in a "tangled mess." *Foley*, 2019 WL 3312196, at *4. The general contractor specifically retained control over the storage of rebar and would require improper storage to be corrected. *Foley*, 2019 WL 3312196, at *2. In this case, where the injury was allegedly caused by the method of moving the curtainwall, Permasteelista was contractually responsible for supplying

21

all labor, material, and equipment to complete the curtainwall installation including transporting the curtainwall. [Dkt. #63-7, Pars. 28, 29, 31; Dkt. #71, Pars. 28, 29, 31]. And to put a finer point on it, the general contractor's superintendent testified that he "controlled the rebar storage" at the jobsite and if he had found the rebar "tangled up" he would have told the subcontractor to correct it. *Foley*, 2019 WL 3312196, at *7.

There is no such evidence here; certainly plaintiff does not direct the court to any. All of the supervisory personnel from the defendant testified that they would have stopped one individual from attempting to move a dolly loaded with curtainwall. But that never happened. The dollies were always pushed by no fewer than two men, which was the typical way it was done and acceptable from a safety standpoint. Also, in *Foley*, the safety manual required subcontractors to comply with its "means and methods" provisions, including lifting and material handling. *Foley*, 2019 WL 3312196, at *2. But, the safety manual here dictated that Permasteelista had to assess any manual lifting tasks and provide "appropriate equipment or lifting aids" and instruct its employees on safe lifting techniques. [Dkt. #71, ¶. 89].

And, finally, in *Foley,* the general contractor's superintendent was on the jobsite every day from 6 a.m., and was part of the safety department. Foley, 2019 WL 3312196, at *1. In the instant case, plaintiff asserts in his brief that defendant had personnel walking the jobsite everyday, but the only paragraph cited in support that is part of the record, paragraph 60 [Dkt. #65, at 9], has nothing to do with defendant's personnel being at the jobsite. [Dkt. #71, ¶. 60]. Moreover, while defendant's personnel were likely at the jobsite, as would be the case with any contractor, no one was "consistently present on the jobsite directing operative details of the subcontractor's work. *Liszkiewicz v. CRG Residential, LLC*, 2017 WL 4512836, at *3 (N.D. Ill. 2017) Indeed,

Permasteelista had an exclusive staging area for moving, lifting, and mounting the curtainwall.

## CONCLUSION

The general rule is that a general contractor is not liable for acts of its subcontractors. For liability to arise, there must be exceptional, as opposed to typical, circumstances. The circumstances here were typical: the defendant retained general oversight. The defendant did not retain control over the means and methods of the subcontractor's work; it did not control the details. Liability, like the devil, would be in those details. Moreover, in order to stave off the defendant's summary judgment motion, the plaintiff had to "'wheel out all its artillery to defeat it.' " *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). Plaintiff's artillery was defective in several respects, and, as discussed, a court can't come to the rescue. The defendant's motion for summary judgment [Dkt. #63] is granted.

**ENTERED:** _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 7/27/20